on behalf of the appellant, William Weygandt. I'd like to reserve approximately five minutes for rebuttal. The primary issue in this case is the sufficiency of the evidence. And Mr. Weygandt was convicted, it's an unusual, very unusual case, he was convicted of a single count of conspiracy to commit fraud in connection with aircraft parts. But in this case, there was no evidence of an agreement between anyone to falsify the forms at issue, the 8130 forms, and certainly no evidence that Mr. Weygandt knowingly participated in any such conspiracy or such agreement, I should say, nor was there any evidence that Mr. Weygandt ever directed any employee to falsify forms or skip tests. In fact, the witnesses expressed they denied they were given any such instruction. So the government's theory instead is that Mr. Weygandt is guilty of this conspiracy charge because he did nothing. And while the government may try to back away from that now, the truth is during closing argument, they made that point at least eight times, the defendant is guilty because he did nothing. This is a very novel theory of criminal liability. I'm not aware of any other case, really, that — on which a defendant has been found guilty of a conspiracy for doing nothing. Well, let me state it kind of the other way, and I'd have your response. I'm anticipating that what I'm going to hear from the government is that Mr. Weygandt is guilty of the fact that these parts are not being tested properly. The employees are bringing this to his attention. The employees are asking him to buy testing equipment that seems to be somewhat expensive in order to do the tests properly so that the repairs are done appropriately. He refuses to do it, and the employees sign off on the forms that things are done properly, and he knows full well what's going on. That's the government's theory. Right. And so let me try to run through each of those steps, because there are flaws in each step of this chain. At the outset, he's the president of the company. Well, that is not enough, and the government concedes that responsible corporate officer doctrine does not apply here. Kennedy, he's the president of the company, and apparently he is very much involved in the actual operations on the shop floor. Earlier in his career, he was actually himself a bench technician. I mean, he knows the business. Well, I think the evidence actually was that he was generally familiar, had a long background in history in the industry, but as far as his management style, he was not a micromanager, and that is in the testimony. He delegated to his managers. He trusted them to do their job. Multiple witnesses testified to that, including the government's witnesses. That's his contention, but there's some evidence that he actually was fairly involved with what went on. He was involved in production meetings, but the production meetings did not make clear to him, despite the government's, you know, insistence to the contrary, that they did not tell him, we are in violation of the CMMs. There were many discussions about equipment, and we need this equipment or we want this equipment, but there's a complete absence of evidence that he was told, if we don't have this equipment, we're in violation of the CMMs. Certainly no evidence anyone said we're falsely certifying that we are. No evidence that he was ever told we're in violation of Federal Aviation Regulations. Sotomayor, why couldn't the jury come to the conclusion that he is the captain of the ship and he started the company? And if I'm not mistaken, it was about 30 or 40 years before this event happened. And he, of all the persons involved in the company, should be aware of the CMM, the Component Maintenance Manual. That's part of the business. He is in this business of aviation components. And if anyone knows that you have to comply with certain requirements, it's him. Why couldn't the jury come to that conclusion? And based on all the evidence that was presented in this case, you are the company official. And employees went to him and said, look, we need to get this tested. And he would say, well, he would just shoo him away. Or at least that's the record now, you know, it's, it is what it is. But the employees did approach him with complaints about components that were not being tested. Right. So let me start with one point, the understanding of the CMMs. So just to be clear in context, there are hundreds of parts, different manufacturers. Everyone has its own CMM. So it's not like there's some poster up there that says these are the CMM requirements and, of course, he would know that. No, everyone has very specific requirements and they change and they're different from manufacturer to manufacturer. So to expect Mr. Wigand to have detailed knowledge of the CMMs is not a reasonable inference. The purpose of an 8130 is to certify that you have complied with the component manual, the component maintenance manual. Right. Or another method of compliance, such as a repair scheme, which there was some testimony there are other methods for complying, which would be if there was a, a, what they called a WRS, a WICO repair scheme. And I can testimony that employees were going to him, approached him and told him, look, we can't test this because we don't have the equipment. Right. On, there are, there's isolated testimony, it's about a half a dozen pieces of testimony where the employees say, you know, we, we talked to Mr. Wigand or, or, you know, our general manager or whatever, but ultimately getting to Mr. Wigand that, you know, hey, we need this equipment. About three pieces of equipment, the Vera drive, the flywheel test, and the vibration table. And if you look at that testimony. But what was the testimony about the response, about Mr. Wigand's response? In several instances, it was just that the testimony was just, he just didn't respond. Or he said, we haven't had any problems. Right. And there were two instances that Mr. Maupin testified to where he said, well, we've been going along fine. So let me address those, because this was not, this was not a refusal to purchase equipment. This was his, reflects his honest understanding that we didn't need this equipment because it's fine. We don't need this equipment to comply. But did the jury have to make that inference, that his response indicated that he thought that they didn't need the equipment, or could the jury have made an inference that he was making a decision not to get the equipment, even though it was needed? Well, and I think on that point, it was the government's burden of proof, and there is no evidence that he, in fact, did know that they had to have this equipment to comply with the CMMs. And in the absence of that evidence, and in the presence of perfectly legitimate alternative explanations, it was not a reasonable inference. There isn't sufficient evidence for the jury to conclude that. Well, but the evidence can be indirect evidence. It doesn't have to be smoking gun evidence or an explicit admission or an explicit statement. So based on the testimony, why isn't that sufficient for the jury to make the inference based on indirect testimony? Well, there wasn't even any indirect testimony that he ever conspired with anyone or agreed or directed anyone to falsify the 8130 forms. At most, you have evidence that he knew that there were some needs for equipment to perform certain tests. And even at the outside, I mean, even if he knew that, well, geez, you know, we've really got to fix this, there's no evidence why he didn't, that it was a refusal or that he was trying to commit fraud. There's just an absence of any intent to commit fraud. But if you have to certify that the repairs have been done and the repairs can't be done properly without the equipment, why doesn't that support an inference that he knew that the repairs should not have been certified? Well, again, he'd have to have the knowledge, which is never explained to him, that these were, that these repairs were necessary to comply with the CMMs. And I mean, my view of the record is that the employees went to him with this form, 8130 form, to certify it, and he wouldn't or told the employees to certify it, but the employees told him that we didn't have the equipment to properly inspect the components in compliance with the manual. No. Actually, no witness testified that they went to him with the 8130. Nobody said we can't file, you know, we can't sign this. And they could have. That's just it. Any one of these employees could have gone, you know, to Mr. Wygant and said, Bill, I can't sign this 8130. We didn't do the test. We can't do the test. We've got to get the equipment. Any one of them could have stopped. But he was told that the test could not be properly done without the equipment they needed. They discussed issues with the concerns they had. You know, we don't have a Veradrive that can run over 14,000. Actually, audits showed that they did have a Veradrive that could run over 14,000. And Mr. Wygant received numerous, numerous audits, internal, external FAA audits. Everyone saying that they were fine. Roberts, your argument is that he did not know that 8130 forms had to be signed? No. That those forms had or were designed to make sure that the components were in compliance with the manual? No. Did he know any of this? No. Not that he didn't know that 8130s had to be ---- I mean, there isn't a lot of evidence on the 8130s, but I think, you know, that even assuming he knew that 8130s had to be signed, there's no evidence that he knew that they were actually in violation. There were many, many instances where, you know, employees would come to him wanting equipment, and his response was not to say, no, I'm not going to buy this equipment. We'll look into it. You know, I'll look into it. We'll put it on the list. You know, or in a couple of instances, I don't think we need it. You know, we've been fine. And there were reasons for that, too. With respect to the vibration table, for example, there was a discussion among the technical managers that, in fact, their equipment was satisfactory. And Mr. Wygant was privy to that. So there's a real absence of evidence that any of these employees ever made clear to Mr. Wygant, hey, you know, we can't comply with these CMMs, and, you know, therefore we're falsifying 8130s. And Mr. Wygant thereafter said, you know, good job, but he will keep on falsifying those 8130s. I mean, there's certainly no evidence of that. Well, you're down to just under 5 minutes. Why don't we hear from the government, and then you'll have 5 minutes to respond. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Michelle Beckwith, and I represent the United States. Your Honors, the jury in this case convicted Mr. Wygant of conspiracy to commit fraud involving aircraft parts after hearing from multiple sources that proved his knowledge and participation in the endemic fraud at WECO. The evidence at trial supported that verdict, and the government argued reasonable inferences from that evidence. The government's allowed to argue such inferences. A jury's allowed to base a verdict on those inferences. I may have mistaken the record. I thought I read in the record that employees did approach Mr. Wygant, if I pronounce his name correctly, Wygant? Wygant, I think. Wygant? Yeah. With forms, and he didn't sign the forms, but they did inform him that we needed equipment to test the components that were repaired, and he did not sign the forms. It told them to sign the forms for him. Could you correct that? Yes, Your Honor. I'm probably mistaken, but you can make. The evidence is he was authorized to sign forms, but there's no evidence that he, in fact, signed forms. Other people were authorized to sign the forms and did sign the forms. The evidence at trial showing his knowledge of the problems comes in the evidence that you just mentioned, which was multiple employees coming to him and saying, we don't have the equipment to do the required tests. And I'd like to expand on that a little bit and just explain what the business is for a moment. That's all that WECO did. All they did was aircraft parts repair. And that business is entirely dependent upon the certification that the parts are repaired in accordance with manufacturer specs or CMMs. There were customers at trial who testified about that, that said if a repair wasn't done in accordance with the CMM, it was worthless. And that's corroborated by the fact that the FAA, when it came to light that all of this had happened for decades at WECO, they issued a notice to all the customers and said, listen, all of these parts are suspect. They should be quarantined and taken off the shelves or taken out of aircraft. And customers testified that's what they did. So, in essence, what the business is is certifying 8130s. If you don't have an 8130 that says we did this repair in compliance with the CMMs, you don't have a sale. No customer is going to accept that. So him saying that he needed someone to spell it out for him as if he were a layman off the street is just absurd. And the jury rejected it as such. It's like saying a barista at Starbucks tells her manager, our coffee makers are broken, and she has to take the extra step of saying, and that means we can't sell coffee today. It's that basic. It's that fundamental. So what happened was the employees came to him and said, we don't have the equipment that can perform the required tests. And the inference from that is that the required test is the test that's called out for in the manufacturer specification in the CMM. Now, you're paraphrasing, of course. But the way you paraphrased it is the employees came to him and said, we don't have the equipment to perform the required tests. Can you help me with this precise language that they use in terms of what they testified to? Absolutely, Your Honor. One of the most specific examples of that is when Mr. Maupin, who was a quality assurance manager who'd worked there for about 20 years, started as a bench tech and then was promoted up, came to Mr. Wygant when they were getting ready to accept this new business of the Honeywell converter. And they needed to get their shop in shape to do that. And so what he testified was that he opened up the CMM, highlighted it, and went to the defendant and said, here is the equipment we have, here is the equipment we can build, and here's the equipment we don't have that's called for in the CMM. And he testified that one of those items of equipment was the vibration test. And the testimony was unequivocal that WECO never had a vibration table capable of doing the requirement in the CMM until after all of this came to light and Gulfstream tried to remedy measures. Another example of this, again, comes from Mr. Maupin when he said that he was in regular contact with Mr. Zito and Mr. Mortimer in Burbank. And that they regularly came to him with request or concerns about the equipment. And at one point, Mr. Maupin did testify that he was concerned, or that they expressed concerns that they were in jeopardy of violating the FARs, the Federal Aviation Regulations. And Mr. Maupin testified that he brought those concerns to the defendant. And that's a direct reference to not being in compliance with the CMMs. If you're certifying that you're doing the work the way it says in the CMMs, and you're not doing the work, that's a violation of the FARs. That's another example. And then there's a testimony of Mr. Mortimer who did say that he repeatedly requested. And you can see this too in his email right toward the end of Mr. Wigand's tenure when he, about two weeks after Gulfstream fired him. Mr. Mortimer wrote an email to Mr. Maupin saying, identifying equipment that we needed, quote, to comply with the CMM. And, I'm sorry, with the manufacturer's specifications. And Mr. Maupin forwarded that to Mr. Wigand. Did you try this case? I was one of trial counsel, yes, Your Honor. Could you help me put this in context? This is something I copied from the record that I saw. Wigand told an employee after the sale to Gulfstream that they could now purchase the equipment lacking because Gulfstream had deeper pockets. Do you recall that? Absolutely, Your Honor. Who made that statement in the context of that? Yes, Your Honor. That was Mr. Maupin. I assume that has to do with the knowledge that we need the equipment, but I couldn't. Yes, it's the government's position that that is direct evidence of his knowledge. Who made the statement? Mr. Maupin testified that Mr. Wigand made that statement after he announced to his employees that the company was going to be sold to Gulfstream. And I don't know if he said it just to Mr. Maupin or to other people, but Mr. Maupin heard him say, now we can finally get some of that equipment we need because we've got, quote, deeper pockets. And then that's, in fact, what happened. After the sale went through, Mr. Wigand stayed on for, I think, a year, or he was supposed to stay on for two years. And he was basically running the shop, and Gulfstream wasn't really that involved in the day-to-day operation. And so when he made his capital expenditures request, lo and behold, he made the very same equipment request that his employees had been asking him to buy over and over for decades. And again, I'd like to reiterate that he was the only person at WECO who was allowed to make those purchases. And multiple witnesses testified to that fact. They couldn't just go out and buy this on their own. You know what I found unfair, though? There was a lot of testimony about his economic status. And it seemed to me that that was portraying a very negative picture of him in the eyes of the jury. Was that really necessary? Your Honor, I believe the point of that evidence was to show that there was money available to buy this equipment. Yes, it was expensive equipment. And it's still inexplicable to me as I stand here today why he wouldn't have used that money to just buy some equipment. I'm thinking of the prejudice effect of it on the jury. Your Honor, it wasn't admitted for that purpose. If there was any- What was the purpose? As I said, to show that there was money available and that Mr. Wigand was just unwilling to spend it on his business. That goes to the same comment that he made about wanting other people with deeper pockets, i.e. golf strings. The fact that money was or was not available doesn't strike me as necessary or relevant to whether or not he is knowingly having his employees perform repairs that are inadequate and then certifying that they are adequate. I mean, the fact that there was money or wasn't money, that's neither here nor there. Well, Your Honor, I would submit that it goes to his MO, his modus operandi of being, for lack of a better word, he's parsimonious when it comes to putting money into his business. Oh, I understand that. Now this kind of goes to Judge French's question. It sounds like you're just trying to dirty him up. Well, we're trying to explain, give the jury some reason why. Why they shouldn't like him. No, Your Honor. Why he just didn't- it's not that he didn't have the money. He just didn't want to do it. And there had to be some explanation for how this could go on for decades and decades. If there is some, if the court does believe that that was the purpose, which I submitted was not, I would submit that that would be harmless error in light of the overwhelming testimony, both in light of the employees' evidence and the defendant's own words that just, that show his knowledge and intent in participation in the scheme. If the court has no further questions, I would submit and ask for the court to affirm the conviction. Further questions? Thank you, Your Honor. Thank you. I will perhaps pick up on the last point first, the greed evidence. I think as the Court has expressed, there's serious concern about that evidence, because it really didn't have any relevance. And I think what it did in this case was appeal to the jury's emotions. And, I mean, not even really true. His salary was not even unreasonable. But to the jury, it sounded like, you know, he was wealthy and greedy. And it did not follow logically from that that he committed fraud in this case. He actually, in debt fact, did spend millions of dollars in buying equipment for the company. So it's not that he wouldn't buy necessary equipment. He, in fact, spent about $2 million in the course of 3 years. This equipment was about $200,000 worth. So it didn't even follow that his greed was what was motivating him not to buy this equipment. And it's not harmless error in this case, not even close, because the very problem in this case is that the jury was led to convict Mr. Weigand based on his position as the president of the company. And added to that, he's wealthy, we should hold him responsible. And that's really the problem here. That is not the law. He cannot be held responsible. We might feel a little uncomfortable about that, and the jury probably felt very uncomfortable about that, wants to hold him responsible. But that's not criminal law. We do hold, you know, we can hold people responsible in the civil context, in the regulatory context. But for criminal law, there has to be criminal intent and criminal participation. And even for a conspiracy, the law is, even if he knows, so let's even just assume he knows that other people are committing wrongdoing, acquiesces and approves of it, in the absence of evidence of an agreement, which we just don't have here, that he actually agreed and knowingly participated in a conspiracy to falsify 8130s, he's not guilty of the crime charge. Going back to some of the evidence. Sotomayor, what's your take on the statement that I read before? There was testimony that Mr. Mygant had told an employee after the sale to Gulfstream that they could now purchase the equipment lacking because they had access to Gulfstream's deeper pockets. All right. And I would say that that doesn't prove that he knew that the equipment was necessary to be in compliance or that, you know, prior to that, he had been, again, agreeing with anyone to falsify the forms. I mean, the evidence, again, really shows that he was never advised that they needed this equipment. He got requests for equipment all the time, as Presidents always do. The statement suggests that he – I don't know who testified. I was just reading the record. But it certainly suggests that he was aware that they needed equipment and that he was not buying it. Right. And I think he was – no, there were definitely times employees went to him and said, you know, hey, we want a new air driver. We want this or that. And he didn't say no. He said, well, we'll look into it. In several cases, I think he determined – I mean, the evidence shows he determined it wasn't necessary. In other cases, it's not clear why. But again, government's burden, it's not clear why he didn't purchase. Ultimately, he says, you know, when he has the deeper pockets, that means, you know, hey, now we can, you know, now we can get some of the things that we wanted all along but haven't been able to purchase. But that doesn't show that he knows they're in violation of Federal aviation regulations. It doesn't show that he knows that they needed these tests for the CMMs. It doesn't show that he knew anyone was falsifying forms certifying that they were complying with CMMs. The only reference to the CMM, just to be clear, the only reference to the CMM in the testimony anywhere, anyone talking to him about CMMs, is the testimony Ms. Beckwith referred to where Mr. Maupin handed him the form, the pages from the CMM. But there is no discussion in there where he said, you know, Bill, we've got to have this to comply. In fact, that testimony comes out, and if you look at that at, I believe it's 4ER, 427 to 36, what their – that context was, they were talking about the WICO repair scheme. And the WICO repair scheme – Kennedy, this is just a conspiracy question. Did you ever make the argument that, well, this wasn't a conspiracy, because while he knew exactly what was going on, he wasn't conspiring with the employees because his employees didn't want to do it? Did you ever make that argument? Beckwith. You didn't want to do it? Didn't – well – Well, let's just say, in order to have a conspiracy, you need to have at least two people who are trying jointly to accomplish something. Beckwith. Did you ever make the argument that Mr. Wigand couldn't have conspired because while he wanted these things to be certified falsely, he wasn't conspiring with his employees because they didn't want to do it? I'm not sure we said that in quite that many words, but I do think that's the essence of our argument, which is there's no agreement here. But all the argument you've been making to us is he didn't know. Well, that's true, too. I'm asking you, did you make the argument that he knew darn well what was going on, the evidence shows that he was going to, but the evidence also shows that the employees didn't want to do it, so there couldn't be a conspiracy. Did you make that argument? Well, Your Honor, I think that it is encompassed in our argument that the evidence is legally insufficient under a conspiracy theory, and that's because there was no evidence of an agreement of a common and a common purpose. Concert of action, common purpose, there is no evidence of that, that anyone was trying to do that. And, yes, it does support that point. But up until this very moment, I've never heard you say anything like the argument that I just made to you. Well, I beg your defer, Your Honor. I do believe that's covered in our briefing and in the legal analysis that we've provided, and because I'm focusing on factual, certain arguments here does not mean, of course, that I'm waiving any others. Thank you, Your Honors. Okay. Both sides, thank you very much. The United States v. White has submitted its decision.
judges: Fuentes, W. Fletcher, Rawlinson